number 22-14058. Mr. Vanderhoff. Yes, Your Honor. Whenever you're ready. Good morning. May it please the court. My name is Chad Vanderhoff, and I'm here today on behalf of the appellant, Isac Schwarzbaum. This case arises out of an action initiated by the United States to collect an assessment made by the IRS. This collection case comes before this court for a second time because the district court ignored this court's mandate and once again erred by entering judgment for the same FBAR penalty that was previously determined to violate the applicable statute. Can I just ask you a question before you get into your argument, just so I understand? The amounts or the recalculated amounts that the IRS provided to the district court and the district court entered an order, was there any evidentiary basis for those numbers or just did the government file a motion saying this is what the numbers are and the district court entered an order? There were some bank statements in the record from the trial phase, and it had June 30 balances for accounts which there was no evidence of a June 30 balance. They used the $100,000. I guess my question is there was no evidence on how they recalculated or how they figured out the new amounts? It was attached to the government's motion for entry of a second judgment. The district court had whatever its significance. The district court had the calculations, the FBAR penalty approval form from the IRS, right? Yes, Your Honor. A multi-page document in which the IRS, for better or for worse, goes through how it calculated the penalties on remand, right? Yes, Your Honor. Okay. Now, here's my point of confusion. I don't know what you say that this did the IRS. Let's do it in steps. What did the IRS do wrong on remand? Putting aside your argument about retaining jurisdiction, what did the IRS do wrong in recalculating the penalties after remand? The penalties that were calculated by the IRS are not the penalties for which judgment was entered. I don't understand that. On remand, the IRS calculated purportedly new penalties, upon which time the government ignored those new calculations and proceeded to ask the district court for entry of judgment for penalties that were identical to those which were in the initial complaint, which had already been rejected. Right, so as I understand what happened here, on remand, the recalculation came up with a maximum penalty of 13,521,328. It was a total of three different calculuses, 4.7 million, 4.5, and 4.291. That's how they got to it. There's no dispute that that was an accurate calculation on remand, is there? We have not challenged that. Okay. And then what the government did is they came back and said, all that's well and good, but we're only asking for less. We're asking for 12,550,813, not including interest and late fees, if I have that right, based upon the first version rather than the second. Was it error for the government to ask for less and the court to give less? It was error for the court to give less. The judge had to give the 13,521,000. Well, our position would be that that would still be time barred by the statute of limitations. No, that's a different issue. That wasn't the question that we started with when Judge Lagoa asked you the question and then Judge Jordan asked you the question. At a minimum, if the district court had entered a judgment for the amount that was calculated by the IRS, that amount would not be facially invalid and not in accordance with the statute. So if we reject your other arguments, we should send it back and tell the district judge she erred in granting the reduction that the government asked for and she'd go back and impose the penalty of 13,521,000? I mean, I ask the question candidly because I have never, ever seen a tax case where the government hit the taxpayer for less money and the taxpayer said you got it wrong and you got to go back for the original fee, which was greater. Our position is that the rationale behind that ask by the government is to avoid the other legal infirmities. How are you aggrieved by a judgment which is less than what the IRS could have been entitled to? Because first, that judgment still does not comply with the applicable statute and second, that second judgment for the exact same amount ignores the harmless error ruling from this court during the first appeal in Schwartzbaum 1. Which harmless error ruling and in what way? The harmless error ruling that non-use of the June 30 balances was not a harmless error. It specifically found that it was harmful and so that was part of the reasoning behind vacating the district court's first judgment, finding that the district court usurped the IRS's authority to determine FBAR penalties. Right, but on remand where there was no balance, there was no statement on the reporting date, the IRS, as I read the sheets, the calculation sheets, used $100,000 as opposed to a percentage of the balance in the account and you say that's not error. So how does that violate the harmless error determination made in Schwartzbaum 1? Because it effectively leaves in place the penalty amounts that were already rejected. They were rejected in essence to be recalculated, not rejected outright. It wasn't a vacation where the assessments were vacated and said that they were entered in error. The way I read the opinion was it was entered in error and sent back for recalculation. The assessments, initially the assessments were set aside by the district court. The district court then took it upon itself to calculate its own penalty amounts. That's what this court vacated the first time, was the district court's entering its own penalty amounts because in the district court's initial ruling, the judge specifically said the FBAR penalties were not in accordance with the law, so they had to be set aside and ordered additional briefing to determine what should be the applicable penalty. During the additional briefing, we commented that because the initial assessments were not in accordance with law, they needed to be set aside and the district court judge specifically commented in her order, Mr. Schwartzbaum, this argument is unnecessary, Mr. Schwartzbaum is asking me to do something I've already done. So the initial IRS assessments had already been set aside and what this court vacated was the district court's judgment. So what your position is is that, I'm just going to do a hypothetical, when the letter of assessment from the IRS went out, that was vacated by the district court judge and then therefore it wasn't a recalculation that was necessary, the IRS had to issue another assessment? Yes, Your Honor. Letter? That's correct. Can you help me with, at least speaking for myself, is the more serious question here and that is whether or not the FUBAR penalties are fines within the meaning of the Eighth Amendment Excessive Fines Clause and if it is, which is a matter of first impression in this court, whether indeed if it falls under that rubric of the Eighth Amendment, is the fine excessive? You are arguing those points as well, correct? Yes, Your Honor. Could you help me with those? Start with the first issue, whether or not the penalty is a fine within the meaning of the Eighth Amendment Excessive Fines Clause. A civil penalty escapes Eighth Amendment review only if it can be shown that it is solely a remedial penalty. Any penalty that serves in part to punish is subject to Eighth Amendment review. Can you tell us why this, I'm sorry. No, go ahead, go ahead. Tell us why the penalty here in part was designed to punish as opposed to simply compensate. There's nothing that the government needs to be compensated for. Mr. Schwartzbaum paid every dollar of tax plus interest plus penalties and alerted the IRS voluntarily to these reporting mistakes, provided the documentation needed to calculate penalties, so it wouldn't fall under the theory of investigatory costs as well. And to date, the United States has not produced a single piece of evidence as to how much they expended on investigatory costs. The penalty is designed to at least in part punish. It's solely a reporting violation. There is no tax due upon filing an FBAR penalty. So your argument is the amount is so large that it can only be designed to punish or deter or something like that, which is clearly punitive in nature. Yes, Your Honor. And in fact, the district court said that FBAR penalties are designed to promote deterrence. Let me ask you the question this way. The only circuit that squarely addressed the issue, as best I can tell, is the First Circuit. And in that case, they rejected your position and they said it wasn't punitive QED. It didn't fall under the Eighth Amendment excessive fines clause. Where did they go wrong? They went wrong by treating the FBAR penalty as solely remedial for the reasons I just stated. And since that case, the Supreme Court came out with the Tyler v. Hennepin County case, and it rejects toast and the cases on which the First Circuit relied in arguing. Can I ask you a question about the excessive portion? Let's assume that I agree that it's, I'm speaking for myself, that it's a fine. Is it appropriate for this court to make or to decide whether or not it's excessive in the first instance, or is that something that would go back to the district court? I think that would have to go back to the district court. The district court refused to address the issue. Why would it have to go back to the district court if it's purely a question of law? There's no fact-finding necessary. All the facts have been clearly stipulated to in the record. Why would we send it back? In that case where there would be no need for any additional evidentiary hearings or supplementation, then I do think that this court could. I'm just really asking the question because it struck me that there are no facts here in dispute. We know the amount of the penalty. The penalty is $12,555,000. We know how that was calculated. We know what the maximum penalty could have been in the case. So there's no factual adducements that have to be discerned by the trial court. Isn't everything clear? Factually, either it is excessive or it isn't measuring it against these yardsticks. And if that's the case, it strikes me as a question that we would be reviewing de novo, and we wouldn't have the need for any fact-finding. Maybe I'm wrong, and maybe it's wiser to send it back.  Assuming we agree with you that the First Circuit got it wrong, it falls under the Eighth Amendment excessive fines clause, should we decide the second question whether or not it's excessive? To the extent that in the district court's initial findings, the district court expressly held that Mr. Schwartzbaum did not knowingly commit these reporting violations. So to the extent that that is sufficient to judge proportionality, then our position would be that it wouldn't need to go back to the district court. All right, so if the case is properly before us on the second prong of the Eighth Amendment, tell us why this is excessive, given the fact that we give a presumption of constitutionality to the acts of Congress. They've made a considered judgment not once but twice when they kicked up the penalties. They've considered this seriously, found this to be a very serious violation, meriting a very substantial penalty. Why is what Congress did excessive under the meaning of the Eighth Amendment? Because the amount of the penalty is grossly disproportionate to the gravity of the conduct, as determined by the district court's ruling that Mr. Schwartzbaum unwittingly committed these reporting violations. That's not exactly right because the district court . . . Not knowingly, I'm sorry. Because the district court found that some of the violations were willful, and that was affirmed in Schwartzbaum 1. Yes, willful based on a reckless standard, not a knowing standard. Understood, understood, but there's still a willfulness finding. Sure. Right? Can I ask you a question? Because this is the question of how you would determine or judge proportionality. When I looked at the record, it seems like for purposes of some of the accounts, I'm looking at 2007, and one of the accounts at the time of June 30th, which is when some of these are calculated, one of the accounts said $11,872, but the penalty assessed was $100,000, which is obviously more than what was in the account at the time. So I guess if we were to write an opinion, how would we go about discussing proportionality? Well, I think that is part of the issue, the fact that based on the statute as written, the FBAR penalty, even for a $10,000 account, as you just stated, can be 10 times that out of $100,000, and combine that when you have multiple accounts. In this particular case, it's an $18 million penalty for what was determined to have been a reckless violation and not a knowing violation. I thought it was a $12,555,000 penalty. The $18 million figure. The judgment was for $17.9 million, so I rounded up to $18,000, and that accounts for interest. Right, but we're looking at this issue. Let's net out these costs and interest, which would be the way we would have to look at it. The number was, if I have it right, and correct me if I don't, the number was $12,558,13. That's accurate. Is the Eighth Amendment problem the use of the 50% formula or the use of the $100,000 flat penalty when you don't have an account balance at the reporting date or a combination of both? I think it's both. So everything is excessive in this case? In this particular case, yes. Help me with... If the government had... I'm sorry, Stan. No, no, you go ahead, please. If the government had imposed... Let's say we're dealing with one of the accounts with over $10 million, right? If the government imposes a $100,000 penalty for that violation for that account, is that constitutionally excessive? In this particular instance? No, make up any taxpayer you want. The taxpayer fails to report a foreign account with a $10 million balance at the reporting date and the government imposes a $100,000 flat penalty for the violation. Is that constitutionally excessive? I think it would depend upon the facts surrounding the noncompliance in the reporting violation. Willful, just like here, based on a recklessness standard? No. Would not be? For a $10 million account? Yes. $100,000? Right. $100,000 for a $10 million account for a willful violation based on a recklessness standard. Violation or no violation of the Eighth Amendment? I think that it... To me, I think that you still have to judge the excessiveness and the proportionality based on the reasons why somebody is or is not willful. Okay, but I'm giving you the hypothetical. Mr. Schwartzbaum's willfulness? Yes. You can use that if you want, or you can make up any other willfulness standard you want. I'm trying to figure out, if we're writing an opinion on this issue, it's not just a determination of what happened here, but it's the stating of a legal principle which is going to guide these cases going forward. And I'm trying to ask you for at least some indication of where the dividing line is. And so, mine is $10 million account, willful violation based on recklessness, and a $100,000 flat penalty. In certain instances, it could be excessive because there is a trend and there is case law that demonstrates that willfulness can be found via constructive notice because the taxpayer signs a tax return. So, if that's the only evidence... But you have more than that in this case. In this case, yes, there is more than that. Isn't that really what our focal point is, counsel? Don't we really look at excessive fines as applied to the individual who socked with the penalty, rather than looking at, theoretically, another case at another time with different numbers and different circumstances? Yes, Your Honor. Our position is that... So, it could be excessive as applied to Jones or Smith, but the question here is whether it was excessive as it was applied to Schwarzbaum. Do I have that right? Yes, Your Honor. So, why is it excessive as... A total figure of $12,555,000. What makes that excessive? It's because it's not in proportion with his level of conduct. Well, how do we measure the level of conduct and proportionality? Do we measure it on the basis of the amount of money in the account? That seems to be what Congress had in mind. If you had $100 million in the account, we can assess up to 50% of that for $50 billion. If you had $50,000 in the account, we could only assess up to half, which would be $25,000. Why is that unreasonable and irrational given the harm that Congress is seeking to ameliorate? Because it still has to be judged based on the conduct and the reasons why somebody may have committed a reporting violation. In this instance... So, it's really driven by intent and state of mind and not by almost anything else? It's driven by... the taxpayers' acts which have led to the reporting violation. Sure, but isn't the government harmed more by a violation, an FBAR violation involving an account of $100 million and an account involving $15,000? And can't the penalties be accordingly calibrated for those two different types of harm? Sure, there's a possibility that they could be harmed in greater sense by a larger account. In this particular instance, there was no harm because all the tax was paid plus interest and plus penalties. So, in this particular instance, there's no... We've taken you way over your time and you've been patient with us. We'll give you all your time for rebuttal. Thank you, Your Honor. Thank you. Mr. Carpenter. Thank you, Your Honors. And may it please the court, my name is Clint Carpenter. I represent the United States in this case. I'd like to begin just really briefly by touching on some of the initial questioning of my friend on the other side. In terms of the evidentiary basis for the numbers, the recalculated numbers, I think as was conceded, they're not in dispute. But that basis is, it was attached to the government's motion. It's in the appendix. It's a document 162-1 and it's a lengthy... It's a multiple page explanation by the IRS of how it arrived at the recalculated penalties and how it applied its guidelines. And then for purposes of some of the accounts where it was unclear what the amounts were, the straight penalty was $100,000. The statutory maximum was $100,000. The penalties that were ultimately determined were determined in the aggregate per year. But the statutory maximum was determined initially on a by-account basis. I'm not sure I understand that. Maybe you can help me. Sure. Let's make it concrete and specific so we can put this issue to rest. The year is 2007. That's one of the three years involved, 07, 08, and 09. In 07, as I read the record, there were five bank accounts involved and where he didn't report. Argush, UBS 6308, UBS 9250, UMB, which was unknown, the amount, and Scotiabank in Costa Rica was unknown. So the June 30th total was $8,621,903. The maximum penalty would be 50%, 4707801. Do I have that right? Not quite. Almost, almost. The only place where you got a little off track was for the accounts where the June 30th balance was unknown. And balances on other dates were known. They were much, at least with one exception, they were in the millions or the hundreds of thousands. But the four accounts where the June 30th balance specifically was unknown, the maximum penalty for each of those was 100,000, or the IRS assumed that it was 100,000 because it didn't have information. Help me. This is what I don't understand. If I add up 11,872, 8,615, it was a negative balance of 5,501 account, and two were unknown. It comes out to 8,621, 4707801. As I understand it, that's the figure that on the recalculation the IRS used to get to the total, and then they did the same thing for the accounts in 2008 and 2009. And what I'm not getting at is did they add an additional 100,000 for the UMB account that was unknown and 100,000 for the Scotiabank that was unknown? Yes. So they determined the maximum for the UBS account that was known. That was the 8,615,000. They determined the maximum for that account in 2007 was 50%. That was 4.3 million. For the other accounts that were unknown, then they added a maximum for each of those of 100,000. So for an aggregate maximum penalty of 4,700, 4,707,800. What about the Argus account? Was that included, the 11,872? That's 100,000. Oh, yes. So that's 100,000 because that's the maximum. So for three of the accounts, he was hit for 100,000, and that was added to the 8,615. Is that how you get to 8,621? 8,621. I'm confused about whether 100,000 was added for each of the unknown accounts and the negative account or not. Yes, 100,000. This is just calculating the maximums. But there was 100,000 for each account where it was either unknown or the amount was less than 200,000. I feel like in the account of U.S.B. 9250, which was a negative account of negative 5,571, you hit Schwartzbaum for 100,000. The statutory maximum is 100,000 for that. At some point, I'd like you to have a discussion about how that's not excessive when it's a negative account or an account that's $11,000 close to 12,000, and you're hitting them with a penalty of 100,000. I understand it's a statutory maximum, but how is that proportional? Well, it's proportional, and this is sort of the weird way that Congress wrote the statute. What triggers the obligation to report and the account balance that you're required to report is the maximum balance during the year being reported. So for 2007, the balance that they were required to report was the highest balance during 2007. But the way Congress wrote the statute is that the penalty is determined based on the balance of the reporting deadline, which was the June 30th of the next year. So in that one case where we had the negative balance on June 30th of the following year, it was negative on that date, but during the year that he was required to report and the amount that he was required to report but didn't for that UBS 9250 account was $15 million. So at some point during the calendar year 07, he had $15 million in that account. That's correct. It so happens that on the 30th of June, it was a negative 5571. That's correct, and maybe the investments really went down. So that's why he was hit for $100,000. That is correct. Not because it was a negative account. That's correct. It was because he was required to report that account because it exceeded the threshold. I take it you would agree that if during the course of the year it was negative 5571 throughout the year and they hit him for $100,000, that would look pretty excessive, wouldn't it? It certainly would, yes. So you couldn't be here to argue that as applied to him for that year, the $100,000 wouldn't have been excessive. It would have been. I think that's right. But I think it's also appropriate to look at these penalties the way the IRS determined them, which was after initially determining individual per account maximum. So to determine excessiveness, you were required to look at not only the June 30th balance but also the maximum balance at some point during the course of the year. I certainly think that would be appropriate, yes. And that's how the IRS's internal guidelines for determining. Why are they pegged that way? Why do you look at the maximum balance during the course of the year rather than the bottom line number on June 30th? What is it in the statute or the regs that suggests that's the way to make the calculus? Well, I think it's appropriate to look at that for excessiveness because the balance during the year is the balance that they required but failed to report. That's the balance that triggered the reporting obligation, and that's part of the information that they withheld from the government by not reporting it. And so the harm to the government comes or follows from not knowing about, for example here, the government not knowing until much later about the $15 million that he had in his UBS account during 2007. The harm doesn't follow from the fact that the next year the balance in that account was negative, which I'll mention the balance in other accounts was much higher and there were new accounts. So money was moved around. But, for example, like in the, I don't know how to pronounce this exactly, AgriLush account, right? I don't either. In 2007 and 2008, the maximum aggregate balances were $15,809, $13,487, and on both of those years, 07 and 08, he got hit with the statutory penalty of $100,000, which is clearly a lot more than he had in those accounts. Yeah, and I think, I mean, the way that the IRS calculates these is they start with per account maximums, but then all the calculations after that, which determine whether and how much they'll depart below the maximum, they determine that in the aggregate. So they're sort of determining an aggregate maximum based on the per accounts. This says maximum aggregate balance. I'm assuming that this is accurate, that this is what the IRS said was the account balance, the maximum account balance at some point in that year. That's right. But they're looking at that account balance plus the UBS account balance, plus the other UBS accounts. But the penalty that was assessed on that account was $100,000. Well, no. I mean, there wasn't a per account penalty assessed. There was an annual aggregate penalty assessed. And the way they got to the number of the aggregate annual penalty began with a calculation of individual maximums, and then from there, the IRS applies its mitigation guidelines and then other things that they look at. Really, it's an excessiveness to make sure the penalty isn't excessive. But all of that is viewed in the aggregate. So they add up the maximums for all the accounts, and then they look at whether that aggregate number is the appropriate number to impose or whether they should impose a little more. I may be the only one confused, so try and help me. I hope I can. We're talking now about the maximum balance, which is what Judge Legault was pressing you on. You would concede that if all you were looking at was the Argus account, the maximum balance of $15,809 in 2007, and you hit him for $100,000, that would be excessive by any fair definition, wouldn't it? I don't think so. Why not? Well, because Congress specifically set these penalties for the maximum to be the greater of $100,000 or 50% of the account balance. But the Constitution trumps what Congress wants to do. Well, I recognize that, but you are correct. I will concede that. But in applying the Eighth Amendment, this court and all the others, it gives substantial deference to Congress's determinations. But I'm trying to find out whether or not you took the whole by looking at the sum of its parts piece by piece by piece. That's why I asked you the question whether you stocked them for $100,000 for the Argus account, for the $92.50 account, the net loss of $55.71, and the two unknown accounts, and then added that up to the rest. Was there a separate calculus that it would be hit for $100,000 for the maximum balance of $15,809 in the Argus account? There was not. The ultimate decision started with an individual account determination of the maximum, but the final number was an aggregate number. And the way that the IRS's guidelines and so forth worked out was that that aggregate number didn't get reduced. But in different circumstances, it could have been. But it would have been done in the aggregate, not— Well, the aggregate was what? The aggregate for 2007— It was $8,621,000, you said. Well, so the maximum aggregate during the year was— $17,699,000. So that's the figure you used to assess a 50% penalty? No, that's the June 30th balance. Okay. Okay, I've got it. Tell me about whether or not the First Circuit got it right, whether or not this penalty is a fine within the meaning of the Eighth Amendment. Why isn't it? It isn't, I think, for both legal and some practical reasons. But we think the First Circuit did get it right. That was the position we advocated in Toth. And the court got it right because Congress designed these penalties to remedy harms that it recognized were exceptional in a number of ways as compared to— that harms from the use of secret foreign bank accounts to evade taxes and launder money and so forth created harms that were exceptional as compared to the use of domestic— We can agree that if the penalty, at least in part, is punitive, it would fall within the ambit of the Eighth Amendment, right? I think that's right with the exception that, you know, my friend on the other side, they're relying strictly on the existence of deterrent effects. And there's that language in Austin that, you know, read in isolation on its own seems to suggest that if there's a deterrent effect, it's punitive. But that language— You have a whole lot more than that here. Your problem goes beyond simply deterrence, doesn't it? I don't think so. Isn't it punitive at least in part, retributive at least in part? Right, and I think— Just bear with me. The cost of investigating is very modest compared to the penalties you're rolling up here. So the government didn't— It didn't cost the United States anywhere near $8,621,000 for 207 or if you add all three years up together, $13,521,000. The amount, the penalty is so far beyond any cost involved, investigative cost. It's not compensatory in any sense. Well, and I think that's where the First Circuit disagreed with you. Yeah, I understand, but why am I wrong? Well, and so because the costs of discovering these foreign bank accounts and stuff, it is much greater. And to give you an example, in this case, you know, my friend has emphasized that the disclosure of the accounts was voluntary, and that's accurate in a very technical sense. But, you know, the district court found in its summary judgment opinion, and we discussed it in our briefing of the first case and also the other currently pending case, it was voluntary only in the narrow sense that the disclosure of his account information was about to be involuntarily disclosed by the Swiss government, and that was the culmination of a years-long effort by the DOJ, the IRS— Let me ask the question this way. I don't mean to cut you off, but I'll just try to get the heart of my question. Does the penalty solely serve a remedial purpose here, or would one have to look at the structure of this statute and conclude there's something more going on than simply remedying compensation? We think it is solely remedial, and that was what Congress intended. And, you know, the requirement isn't that it be, you know, a one-to-one remedial in a particular case. Congress looks at the question whether a penalty is remedial or punitive for fines purposes. Well, if it's remedial, remedial would be just I'm paying the tax and I'm paying the penalty of what I owe, and that's it. No, absolutely not. And that's one of the lessons of the Supreme Court's decision in Mitchell. Mitchell, the Supreme Court, held that tax penalties are remedial and not punitive, but even though those tax penalties are imposed on top of the tax that's owed. That one was—you're referring to Halvering? Halvering v. Mitchell. Mitchell. Yeah, sorry. Halvering was the name of the IRS commissioner. I mean, your best answer—well, I shouldn't say your best answer because I only speak for myself. One of your answers is that if you were applying the methodology of recent Supreme Court cases, there might be an argument that this is at least partly punitive, that the scheme is at least partly punitive. But there are a number of older Supreme Court cases which have not been overturned, are still good law, which we have to navigate with and around, and those include Emerald-Cut-Stone, Stockwell, and Halvering. Correct. Halvering involved a willful tax violation with, if I remember correctly, a 50% penalty imposed on top. It was either 50—I thought it was 70, but it might—yes, it's a tax fraud penalty. Maybe higher at some other end, but at the very least, a 50% penalty imposed on top of the taxes owed. That's right. The Supreme Court said not a fine, not excessive, etc. They said it was remedial. It was a double jeopardy case, so they didn't have to go beyond that. Different sort of case, but— Yes, they said very clearly that it was remedial. It was remedial despite the fact that it was pegged to the amount of the tax, right, which is in some ways roughly similar to the amount of the account balance at year's end here, right? And it said it was remedial. So those cases were the ones that the First Circuit not exclusively but largely relied upon. That's right. Those in the early forfeiture cases, they go back—sorry, customs forfeitures, they go back to the founding. Doubling the amount of the goods that were not paid through customs duties or the like, even though the customs duties would have been much less than the amount of the goods. That's right. And in Bajikadzian, the court specifically distinguished those early customs forfeiture statutes because they weren't tied to criminality, which is our argument about— Complicated terrain. Complicated terrain, and if I may really quickly emphasize that the court doesn't necessarily need to decide that. If the court were to conclude that these penalties in this case aren't excessive regardless, the court wouldn't have to decide— Let me ask you the question this way. Statutes generally which focus on the defendant's culpability, where the state of mind becomes an issue, where willfulness becomes an issue, tend to look more like punitive statutes than purely compensatory statutes. Isn't that what you have here? That is to say, in order to get the kick-up beyond $100,000, the statute requires willfulness. Beyond $10,000, but yes. Once you're asking a willfulness question, doesn't it make the structure of the fine here look more punitive in nature than purely compensatory in nature? Well, I think the First Circuit's answer to that was— I'm asking your answer. Well, and I'll make it my answer as well, would be that they can both be remedial and that Congress can just decide that persons who violate willfully should be responsible for a greater share of the remediation. So, yeah. But I think also it's relevant that Congress established a separate criminal penalty that expressly called a fine in the statute and that it imposed those criminal penalties where applicable on top of the civil penalties. So a person who's criminally willful, which is a higher willfulness standard, a person who's criminally willful can also be held— But interestingly enough, the maximum fine for the crime is a maximum of five years in jail or a quarter of a million dollar fine. That's right. Which I hear the maximum penalty is 50%. So if I had $10 million on deposit with Credit Suisse in Geneva and I didn't report the $10 million over two years, under this statute, the first year you could take and you could prove my conduct was willful, you could take $5 million in the first year and $5 million in the second year and completely extinguish the account, couldn't you? Under the statute, yes. But I would say that the IRS has guidelines that prevent that from happening. But yes, the way the statute— Rarely do we— That could happen. Counsel, respectfully, rarely do we rely on the good faith of the tax man in looking at these questions. Well, I don't know that I would agree with that. I understand. But— I understand. Bear with me. Sure. The government doesn't calculate Schwarzbaum's penalty with any reference to any of the losses or expenses it incurred. Isn't that right? That's right. But that's also true of other penalties that have been held remediable. I understand. But it's one indicia. I don't say this is an easy question. Sure. I'm simply suggesting to you the method of calculating penalty has to do—nothing to do with compensating the government for its time and its effort. I would just say, except that, at least in Congress's view, that the amount of the account balances that were not disclosed as they were required to be— Congress viewed that as an appropriate proxy for the harm that was caused to the government. Let me put it a little— By tying it to the account balance, it's being tied to harm, although it is certainly not precisely— But the penalties themselves are wholly unrelated to the need to compensate the government for the cost of the investigation. I mean, I just would disagree with that. And the First Circuit disagreed, too. Well, it's because Congress could reasonably decide that the harm to the government, the harm to society, the cost of investigation, prosecution, the cost of enforcement, all of that, that the balance— the amount of money that the violator failed to report is a reasonable proxy for that harm. And so by tying it to the account balances, it is at least closer to remedial than, for example, the criminal penalty, which I would say, by Congress setting a separate penalty that is just a flat amount that's not tied to anything, reflects at least Congress's intent, whether they were successful or not. Their intent was that that criminal penalty would be retributive, whereas the civil penalty would be tied to the account balance as a means of roughly reflecting the amount of harm caused. Let me ask you this question. Roughly remediating that. Assume for the purpose of my question that we were to conclude, whether it's excessive or not, this is something that falls within the ambit of the excessive fines clause of the Eighth Amendment. That's only half the story here. The second part of the story is whether it's excessive. Is that an issue that this court should address, Ab Initio, or should that go back to the district judge? I don't think it needs to go back to the district judge. I think the colloquy you had with my friend brought out that the relevant facts are known and that the court can decide it as a matter of— It's a purely legal question or a mixed question of application of known given facts to the law. I think that's right. If the court were to get into its analysis and find that there was some fact that really the correct decision couldn't be made without knowing it, then a remand could be appropriate. But I think both sides think that the question can be decided on the facts that are known. My last question, and you've been very helpful to me. My pleasure. Is it fair to review the question of whether the penalty is excessive only as applied to Schwartzbaum? We're not asking the question in a more general kind of way. Is that the right way we should be looking at it, or should we be looking at it more generically and abstractly? That's the way that the courts, including the Supreme Court, have looked at it. I think that that kind of highlights some of the practical difficulties that perhaps come into play. If the court were to sort of rule broadly that just deterrence alone turns a penalty punitive, well, then every civil penalty is punitive. Then you have to have individualized Eighth Amendment determinations for every kind of civil penalty that there is. But, yeah, I think that's how the court looks at it. Certainly, in this case, since we're dealing with a statutory maximum, I think maybe it could make sense to look at it as, is the statutory maximum excessive as sort of an abstract matter? But I can't say that there's any supporting case. I have one final question, which is I just want to confirm. The penalty, the statutory maximum penalty for the account for $100,000, that's determined only based on the June 30th balance? The statutory maximum is determined based on the June 30th balance. But it's an either or. Yeah, it's the greater of 100,000 or. But it's based on June 30th. Right. So to figure out which is greater, you have to look at the June 30th balance. Okay, Mr. Carpenter, thank you very much. Might I make one last point? Haven't you made them all? I just would like to make one last point about excessiveness, which regards a case you authored, which was Yates. My friend, in their briefing, they've emphasized that the penalties in this case are, I think, 10 times to between 10 and 30 times greater than the tax loss. They called it 1,000 percent to 3,000 percent. I did the math. And in that case, the false claims act penalties that the court found were not excessive, exceeded the actual damages by 156,047 percent or 1,560 times. And so the fact that these penalties may have exceeded just the tax loss by multiples does not alone make it excessive. All right, thank you very much. Thank you. Mr. Vanderhoff, tell me what you do on the excessive fines issue with the old cases like Halvering and Emerald Cut Stone and the like. I believe, Your Honor, those cases are easily distinguishable because, number one, when we're talking about a tax liability in an unpaid tax, there is a monetary loss to the government. My colleague just commented up here that in this particular instance, the loss was the loss of withheld information. Second to that, I believe Mitchell was a 50 percent case, and that was an addition to the unpaid tax. Right, which seems to be just a rough figure taken for administrative convenience and at least some deterrent purposes. Hey, you willfully failed to pay. We're going to sock you. And we're going to sock you with not just a flat fee of some kind set forth in statute, but it's going to be 50 percent of the taxes you should have paid. That seems a little like this case. Somewhat, but it's not an apples-to-apples comparison because we're talking about a 50 percent penalty that's added to the unpaid tax where an F-bar penalty is 50 percent. As Judge Marcus commented, a hypothetical $10 million account based upon the statutory penalty could be wiped out completely over a two-year period if there was a finding of willfulness. With respect to how it applied to Mitchell, we're talking about an unpaid tax, which was based on an amount of income that was earned by a principal amount of money. And the 50 percent attaches to the top line figure in the Mitchell case, but in an F-bar context, the 50 percent attaches to the bottom line figure. So it's not an equal apples-to-apples comparison. I don't pretend that they are. I think it's a hard area. But the more recent cases, it seems to me, pull in your direction, and the older cases pull in the government's direction because you've got the customs duty cases too where twice the amount of the good, despite the much smaller duty that was evaded, becomes the penalty. And that's deemed to be purely civil in nature. So it's a hard issue. And I didn't mean to suggest that Mitchell was exactly like this case. Of course. I'm curious, counsel, do you know of any other civil penalty in the entire federal code where the penalty is as substantial as it is here? Fifty percent of the amount of an account in one year? If it goes two years, it amounts to the entire thing? Not in the same context. I mean, there is a tax penalty for civil fraud, which is a civil penalty, and that's 75 percent. But, again, we're talking about in addition to the top line figure of an unpaid tax liability and not the bottom line number of an individual's entire net worth. Okay. Thank you both very much. Thank you. Thank you.